**Cherie LEMPERT, Plaintiff,**

v.

**Gerald SINGER, Joan Sparling, and Kevin D'Amour, Defendants.**

**Civ. No. 90–200.**

District Court, Virgin Islands, D. St. Thomas and St. John.

June 17, 1991.

Memorandum on Motion for Final Judgment Aug. 28, 1991.

 

Bornn Bornn Handy & Rashid by Katherine E. Harsch, Charlotte Amalie, St. Thomas, V.I., for plaintiff Cherie Lampert.

Nancy D'Anna, Cruz Bay, St. John, V.I., for defendant Gerald Singer.

Bryant, White and Associates, P.C. by Britain H. Bryant, Christiansted, St. Croix, V.I., for defendant Joan Sparling.

Kevin D'Amour, pro se.

OPINION

ROBERT L. CARTER, District Judge, Sitting by Designation.

This action arises out of plaintiff Cherie Lempert's purchase of a house and the half-acre lot on which it is built, Parcel Number 31 of Estate Fish Bay on the island of St. John (the "property" or "31 Fish Bay"). Lempert bought the property from defendant Gerald Singer through his broker, defendant Joan Sparling. Defendant Kevin D'Amour was Lempert's attorney for the transaction. At times, Jack Dadlani, an associate of D'Amour's, handled this matter for D'Amour. Lempert retained D'Amour after she had signed the contract of sale on October 25, 1989, but before the closing on March 1, 1990. At the closing, D'Amour accepted the deed to the property on Lempert's behalf, pursuant to a power of attorney executed by Lempert on February 22, 1990.

Subsequent to the closing, Lempert decided that she was unhappy with the purchase. Her reasons apparently included the condition of the house and the existence of a road through the middle of her half-acre lot, constituting an easement of access to two other parcels, Numbers 32A and 32B Estate Fish Bay ("32A Fish Bay" and "32B Fish Bay," respectively). Lempert maintains that she was unaware of the existence of the easement until after the closing.

Consequently, Lempert brought this action seeking rescission of the sale and damages. She alleges that the power of attorney was signed under duress. She also asserts that Sparling is liable for misrepresentation and for breach of fiduciary duty, and that Singer is liable for Sparling's acts on the basis of the agency relationship between Singer and Sparling. Lempert's claims against D'Amour are based on allegations of legal malpractice and breach of fiduciary duty.

Lempert has filed a motion to amend her complaint to add additional defendants. Singer, Sparling and D'Amour oppose the motion. Singer and Sparling have separately moved for summary judgment in this case. D'Amour has filed what he labels a motion for partial summary judgment, but it appears actually to be a motion for complete summary judgment with respect to him. Lempert opposes these motions.

### Motion to Amend Complaint

■ Sparling works for American Paradise Real Estate Company ("American Paradise"), which is apparently owned by Sparling and/or her husband, Kevin Smith. Lempert's motion for leave to amend her complaint seeks to add American Paradise and Smith as defendants. Lempert has not, however, attached a proposed amended complaint. Any motion must set forth the grounds on which it rests and the relief which it requests with particularity. *See* Rule 7(b)(1), F.R.Civ.P.; V.I.Code Ann. tit. 5, app. V, rule 6(b) (1982). Because the court does not know precisely what Lempert intends to allege against American Paradise and Smith in the amended complaint, it is not in a position to evaluate the merits of the motion. The motion to amend the complaint is therefore summarily denied.

### Summary Judgment Standard

Under the Federal Rules of Civil Procedure, as made applicable to this court by § 24(b) of the Revised Organic Act of the Virgin Islands, 48 U.S.C. § 1614(b) (1988), a motion for summary judgment must be granted if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue of material fact and that the moving party is entitled to judgment as a matter of law." Rule 56(c), F.R.Civ.P. Summary judgment is appropriate if the evidence is such that no reasonable jury could return a verdict for the non-moving party, taking into account the evidentiary standard of proof. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 252, 106 S.Ct. 2505, 2510, 2512, 91 L.Ed.2d 202 (1986).

In other words, Rule 56(c) "mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S.Ct. 2548, 2552, 91 L.Ed.2d 265 (1986). While the moving party has the burden of informing the district court of the basis of its motion, it need not support its motion with evidence negating the opponent's claim. *Id.* at 323, 106 S.Ct. at 2553.

### Power of Attorney

The resolution of the motions for summary judgment turns in part on whether D'Amour had authority, actual or apparent, to act as Lempert's agent in regard to the sale. Lempert argues that she cannot be bound by D'Amour's acts because the power of attorney was signed under duress.

The American Law Institute's Restatement of the Law is binding in the Virgin Islands, to the extent that it does not conflict with a statute. V.I.Code Ann. tit. 1, § 4 (1967); *see, e.g., Francois v. Francois*, 599 F.2d 1286, 1291, 16 V.I. 130 (3d Cir. 1979), *cert. denied*, 444 U.S. 1021, 100 S.Ct. 679, 62 L.Ed.2d 653 (1980). Under the Restatement, a contract signed under duress is ordinarily voidable at the option of the party so signing it. *Restatement (Second) of Contracts* § 175 (1979) [hereinafter *Rest.2d Contr.*].

■ A power of attorney is not a contract, but is merely a document evidencing to third parties the existence of an agency relationship and the powers of the agent. The creation of agency depends, however, on the consent of the principal and the agent; thus, the doctrine of duress as applied to contracts may also be applied to the creation of agency. *See Restatement (Second) of Agency* § 15 & comment c, § 376 (1957) [hereinafter *Rest.2d Agency*]. Moreover, if the power of attorney was signed under duress imposed for the purpose of securing consent to the deed, it follows that the duress in the making of the power of attorney was also duress in the making of the deed.

Lempert maintains that she wanted to attend the closing of the sale, but was unable to be there because of her mother's need for Lempert's assistance in packing and moving, because Lempert's stepfather was in the hospital. Affidavit of Cherie E. Lempert in Support of Plaintiff's Opposition of Defendant Kevin D'Amour's Motion for Summary Judgment ¶¶ 17–19 [hereinafter Lempert Aff.Opp. D'Amour]. According to Lempert, she "was told," *id.* ¶ 21—apparently by Dadlani and Sparling, *see id.* ¶ 20—that the closing date "could not be changed," *id.* ¶ 21, and that the defendants gave her no reason why that date could not be changed. Transcript of Oral Deposition of Cherie Ellen Lempert, Jan. 16, 1991, at 246 [hereinafter Lempert Dep.].

Lempert argues that D'Amour had a "fiduciary obligation" to reschedule the closing, "if possible," so that she could be present. Memorandum in Support of Plaintiff's Opposition to Defendant Kevin D'Amour [*sic*] Motion for Summary Judgment 2. She contends, without citing any support in the affidavits or depositions, that she "did not know all the facts, because Defendant D'Amour deliberately chose not to inform her in order to gain for himself the earliest possible receipt of his fees," and that "[i]f she had known that the closing date could be easily altered without penalty to suit her availability, plaintiff obviously would not have executed the Power of Attorney." *Id.* at 4.

Under the second Restatement, there are two types of duress: duress by physical compulsion and duress by wrongful threats. *Rest.2d Contr., supra,* §§ 174–175 & introductory note preceding § 174; *accord* E. Farnsworth, *Farnsworth on Contracts* § 4.16 (1990). Lempert does not contend that she was physically compelled to sign the power of attorney or that she was induced to sign it by threats. Rather, she relies on language in the first Restatement which defines duress to include "any wrongful act of one person that compels a manifestation of apparent assent by another to a transaction without his volition." *Restatement of Contracts* § 492(a) (1932) [hereinafter *Rest. 1st Contr.*]; *see also id.* § 493.

The Restatement commentary makes clear, however, that this type of duress requires "compulsion without the exercise of volition on the part of the person subjected to the duress, as where he is a *mere mechanical instrument* or *wholly unaware* of the nature of what he is doing." *Id.* § 492 comment a (emphasis added). In other words, acting "without [one's] volition," *id.* § 492(a), in this context does not refer to mere absence of free and informed consent but refers to something akin to physical compulsion. The illustrative examples involve a person who was forced to sign a written contract by another (1) who physically prevented him from reading the contract and threatened him with bodily harm if he did not sign it, (2) who grasped his hand and physically made him sign the document, and (3) who told him to sign the paper while he was under complete hypnotic control. *Id.* § 494 illustrations 1–3; *see id.* § 492 comment h. The language of the commentary pertaining to duress by threats—the other type of duress—makes clear that the word "volition" is to be read broadly in this context: duress by threats requires "threats that cause such fear as to induce the exercise of volition," *id.* § 492 comment a, although the fear "precludes [the person exercising volition] from exercising free will and judgment." *Id.* § 492(b). Finally, the reporter's note indicates that the "duress by physical compulsion" section of the second Restatement is directly based on the "compelled apparent assent without volition" subsection, § 492(a), of the first Restatement. *See Rest.2d Contr., supra,* § 174 reporter's note. It is thus obvious that § 492(a) applies only in situations involving something akin to physical compulsion. Lempert is unable to claim duress on this basis.

Lempert also has no claim of duress by threat. Even assuming that the defendants' alleged insistence on not rescheduling the closing constitutes a "threat" to cancel the deal, Lempert has not made any case for duress, since she has not shown that the threat was improper and that it left her no reasonable alternative.

■ First, such a "threat" is not improper. *See Rest.2d Contr., supra,* § 176; 13 S. Williston, *A Treatise on the Law of Contracts* § 1606 (W. Jaeger 3d ed.1970). Common experience dictates, and the commentary to the Restatement makes explicit, that "[a]n ordinary offer to make a contract commonly involves an implied threat by one party, the offeror, not to make the contract unless [that party's] terms are accepted by the other party, the offeree. Such threats are an accepted part of the bargaining process." *Rest.2d Contr., supra,* § 176 comment a. A threat is improper only if "the resulting exchange is not on fair terms, and ... the threatened act would harm the recipient and would not significantly benefit the party making the threat," *id.* § 176(2)(a), or under other specified circumstances not pertinent to this case. Lempert is clearly unable to show that the supposedly threatened act—refusal to sell her the property—could have harmed her in any way. Indeed, if the property had not been sold to her, she would not be here seeking relief today. Moreover, she has made no showing that the defendants had no legitimate reason for refusing to reschedule the closing. Lempert had already been allowed to extend the closing beyond the date specified in the contract, and Singer or Sparling may

have been justifiably impatient to have the deal completed.

■ Second, an improper threat constitutes duress only if the threat "leaves the victim no reasonable alternative." *Rest.2d Contr.*, *supra*, § 175(1). Lempert's argument amounts to nothing more than an argument that she had a difficult choice to make: she could have attended the closing and not assisted her mother (possibly making alternative arrangements for someone to help her mother), signed the power of attorney, or chosen not to purchase the property. Lempert does not state that it was impossible for her to arrange for someone else to help her mother; if she had made such arrangements, she would have had no difficulty in attending the closing. More important, if Lempert had chosen not to buy the property, then—as already noted—not only would she have suffered no economic loss, but she would not be before the court today seeking rescission of that very purchase. She therefore has no basis upon which to claim duress. *See* 13 S. Williston, *supra*, § 1604 at 667 ("one who is seemingly forced into a contract while also according deference to the possibility of gain from the transaction, is not under duress"). The transaction of business often requires difficult choices, and "[d]riving a hard bargain is not sufficient to constitute duress." *Grad v. Roberts*, 35 Misc.2d 811, 813, 231 N.Y.S.2d 516, 518 (Sup.Ct.Trial Term 1962), *rev'd*, 19 A.D.2d 718, 242 N.Y.S.2d 462 (1963), *rev'd*, 14 N.Y.2d 70, 198 N.E.2d 26, 248 N.Y.S.2d 633 (1964).

■ Lempert also contends that Dadlani (as D'Amour's agent) and Sparling "kept insisting that [she] execute the power of attorney." Lempert Aff.Opp.D'Amour, *supra*, ¶ 16. However, "insisting" is not the same as coercion, which is always a necessary element of duress. *See Plechner v. Widener College, Inc.*, 569 F.2d 1250, 1260 (3d Cir.1977) (applying Delaware law); 13 S. Williston, *supra*, §§ 1604, 1608; 17 C.J.S. *Contracts* § 168 at 944–47 (1963). Unless she can show that she was "overborne and deprived of the exercise of free will," *Smith v. Whitman*, 75 N.J.Super. 228, 183 A.2d 89, 96 (App.Div.1962), *modified*, 39 N.J. 397, 189 A.2d 15 (1963), or that she was placed in "such fear as to preclude [her] from exercising free will and judgment," *Rest.1st Contr.*, *supra*, § 493; *see id.* § 492(b), Lempert cannot make a

case for duress on this basis. *See also* E. Farnsworth, *supra*, § 4.18 at 440; 17 C.J.S. *Contracts* § 168 at 944, 947–48.

■ Though she may have executed the power of attorney reluctantly—that is, she was unhappy about the choices that were available to her—Lempert has presented no evidence that would allow a finder of fact to conclude that she did not freely choose to do so. The misfortune of her stepfather's illness may have been a factor in Lempert's choice, *see* Lempert Aff.Opp. D'Amour, *supra*, ¶ 19, but that illness was obviously an event totally beyond the defendants' control, and they cannot be held responsible for it. Taking advantage of an existing hardship is not duress. *See Rest.2d Contr.*, *supra*, § 176 illustration 14; 13 S. Williston, *supra*, § 1608 at 682 ("force of circumstances for which the other party is not responsible" is not duress or undue influence); *cf., e.g., Harsco Corp. v. Zlotnicki*, 779 F.2d 906, 911 (3d Cir.1985) ("economic duress," recognized under Pennsylvania law, is present only if defendant brings about the financial distress), *cert. denied*, 476 U.S. 1171, 106 S.Ct. 2895, 90 L.Ed.2d 982 (1986).

■ Lempert also relies on the doctrine of undue influence, which is sometimes regarded as a species of duress. *See* 13 S. Williston, *supra*, § 1603 at 659. Undue influence "is unfair persuasion of a party who is under the domination of the person exercising the persuasion or who by virtue of the relation between them is justified in assuming that that person will not act in a manner inconsistent with his welfare." *Rest.2d Contr.*, *supra*, § 177(1). The "ultimate question" in determining if persuasion was "unfair" is "whether the result was produced by means that seriously impaired the free and competent exercise of judgment." *Id.* § 177 comment b.

■ To be sure, Lempert was justified, by virtue of the attorney-client relation, in assuming that Dadlani would not act in a manner inconsistent with her welfare. *See United States v. Reed*, 601 F.Supp. 685, 704 (S.D.N.Y.) (Ward, J.), *rev'd on other grounds*, 773 F.2d 477 (2d Cir.1985); *Restatement (Second) of Torts* § 551 comment f (1963–64, 1976–77) [hereinafter *Rest.2d Torts*]. Lempert has not, however, raised any genuine issue of material fact that the "free and competent exercise of [her] judgment" was in any way impaired. She did not blindly trust Dadlani

and Sparling, but insisted that she did not want to execute the power of attorney and that she wanted to attend the closing. Lempert Aff.Opp.D'Amour, *supra,* ¶ 15. Only when she became aware of the extent of her stepfather's illness did she choose to execute the power of attorney. *See id.* ¶ 19.

Dadlani's alleged statement that the closing date "could not be changed," without more, cannot constitute unfair persuasion. By its plain meaning, the statement does not necessarily indicate that rescheduling the closing would be physically or legally impossible, or that there would be any legal "penalty" for rescheduling it. It could simply mean that Sparling or Singer, for example, was unwilling to close on any other day. In colloquial usage, "I can't" often means nothing more than "I won't." Sparling and Singer may have had good reason for refusing to reschedule the closing. Furthermore, Lempert has not presented any evidence whatsoever that it was in fact possible, in any sense of the word, to reschedule the closing.

Dadlani's alleged statement that the power of attorney was "for the file," *see id.* ¶ 14, also could not have misled Lempert. By her own admission, Lempert knew that the purpose of the power of attorney was to authorize D'Amour to close the deal for her in her absence. *See id.* ¶ 15. Nothing else in Lempert's submissions even remotely suggests the existence of persuasion that was so unfair as to impair the exercise of her judgment.

■ The presumption of undue influence established in *Francois v. Francois, supra,* 599 F.2d at 1292, is not applicable to this case. *Francois* applied the law of constructive trusts to a situation involving a relation of trust and confidence between husband and wife, in which the husband was under the domination of the wife. Under those facts, the Court of Appeals held that when property is transferred from the servient partner to the dominant partner, the burden of proof is on the transferee to disprove the charge of undue influence. *Id.* at 1292; *see also* 13 S. Williston, *supra,* §§ 1626, 1626A; 3 J. Pomeroy, *A Treatise on Equity Jurisprudence* §§ 951a, 956 (S. Symons 5th ed. 1941). The transferee must show the absence of undue influence by clear and convincing evidence. *See Cruz v. Melendez,* 902 F.2d 232, 236 (3rd Cir.1990). Otherwise, a constructive trust will be imposed on the property to prevent

unjust enrichment. *Francois, supra,* 599 F.2d at 1291; *see Restatement of Restitution* §§ 160, 166 (1936) [hereinafter *Rest.Restitution* ]. Undue influence by a third party, other than the transferor or transferee, can result in a constructive trust unless the transferee gave consideration prior to receiving notice of the undue influence. *Id.* § 167.

■ The presumption of undue influence, established in *Francois,* does not apply to a real-estate transaction on the basis of the relation between the buyer and her attorney, where the attorney is not a party to the transaction and the attorney's only pecuniary interest in completing the transaction is in the early receipt of his fees. *See* 3 J. Pomeroy, *supra,* § 957 (the presumption applies to transactions *between* parties to a fiduciary relationship). It also does not apply to a real-estate transaction on the basis of the relation between the buyer and the seller's broker, where the broker's only pecuniary interest is in the receipt of her commission. If the court were to apply the *Francois* rule to cases such as this, every real-estate transaction in which a broker was used or an attorney was consulted would become inherently suspect. Such a rule would severely undermine the ability of buyers and sellers in the real-estate market to make binding contracts. The concern of *Francois v. Francois* for protecting weak-willed persons from economic abuse by dominant others is quite meager in the context of an ordinary sale of residential real property between unrelated individuals when there is no evidence that the will of one of the parties to the sale was actually overborne. Accordingly, the court declines to extend the holding of *Francois* to circumstances such as this.

For these reasons, the court concludes that Lempert has not presented sufficient evidence to establish a triable issue of fact concerning the validity of the power of attorney. It is clear, as a matter of law, that D'Amour had both actual authority and apparent authority to act on Lempert's behalf with respect to Singer and Sparling. *Tort Liability for Pecuniary Loss Resulting from Misrepresentation Regarding the Easement*

Lempert seeks damages from Sparling for certain alleged misrepresentations to her in connection with the sale. Lempert's claim for damages for misrepresentation

sounds in tort. *See Rest.2d Torts, supra,* §§ 525–552C.

Lempert specifically alleges that Sparling failed to inform her of the existence of the easement of access to 32A and 32B Fish Bay running across the middle of her property and failed to inform her of the boundaries of the property. Essentially, this amounts to only one alleged misrepresentation: Lempert knew of the existence of the road constituting the easement, but she was not aware that it ran through the middle of the half-acre lot that she purchased.

A misrepresentation is an assertion that is not in accord with the facts. *Rest.2d Torts, supra,* § 525 comment b. Nondisclosure of a known material fact is a tortious misrepresentation only if the person who has failed to disclose the fact is under a duty to the other to exercise reasonable care to disclose it. *Id.* § 551.

■ The parties have devoted much attention to the scope of a real-estate broker's duty of disclosure. The rule in a number of jurisdictions, and apparently the rule that this court must follow under the Restatement, is that a general duty to disclose all material facts exists if and only if there is a relation of trust and confidence between the broker and the buyer. *See id.* § 551(2)(b). A relation of trust and confidence can be either an inherent fiduciary relation or a confidential relation that arises when one person has gained the confidence of the other and purports to act or advise with the other's interest in mind. *See In re Estate of Millin (Galiber v. Bryan),* Civ. No. 89–334, slip op. at 3 (D.V.I.App.Div. Aug. 29, 1990); *Rest.Restitution, supra,* § 166 comment d at 676–77. At one extreme, some jurisdictions appear to find an inherent relation of trust and confidence between broker and buyer as a matter of law. *See Easton v. Strassburger,* 152 Cal.App.3d 90, 99, 199 Cal.Rptr. 383, 388 (1984); *see also Secor v. Knight,* 716 P.2d 790, 795 n. 1 (Utah 1986) (approving *Easton*). At the other extreme, some jurisdictions find such a relation only when the broker is actually the buyer's agent, in contrast to the normal situation in which, as here, there is an express agency agreement between the seller and the broker. *See Lewis v. Long & Foster Real Estate, Inc.,* 85 Md.App. 754, 584 A.2d 1325, 1329 (1991); *cf. ECC Parkway Joint Venture v. Baldwin,* 765 S.W.2d 504, 512 (Tex.Ct.App. 1989).

■ It is not necessary to decide the scope of Sparling's duties of disclosure to Lempert, however, because Lempert has produced evidence that would allow a jury to conclude that a misrepresentation occurred independent of any duty to disclose. Specifically, Lempert has testified in her deposition that Sparling, through gestures, indicated that the property ran up the hill behind the house, when in reality, the property was situated on both sides of the road. Lempert Dep., *supra,* at 80–81, 239–40. Though Sparling may dispute these allegations, the court on a motion for summary judgment may not weigh the evidence, but must accept the evidence of the non-moving party and draw all reasonable inferences in that party's favor. *Anderson, supra,* 477 U.S. at 249, 106 S.Ct. at 2511. Sparling did not specifically state that the property ended at the road. Lempert Dep., *supra,* at 240. A reasonable jury, however, could find that Sparling's gestures constituted a representation that the entire half-acre property was located on one side of the road.

■ Although Lempert has raised a genuine issue of fact as to the existence of a misrepresentation, it remains to be determined whether that issue of fact is material to the resolution of this case. Specifically, tort liability for a misrepresentation of fact in a sale, rental or exchange transaction requires that the matter misrepresented was material, that the misrepresentation was made for the purpose of inducing the plaintiff to act or to refrain from action in reliance upon it, that the plaintiff justifiably relied on the misrepresentation, and that the reliance caused pecuniary loss. *See Rest.2d Torts, supra,* §§ 525, 538, 552C; *see also id.* §§ 526–537, 540–551. The court assumes, for the sake of argument, that the alleged misrepresentation was material and made for the purpose of inducing reliance. Lempert, however, has failed to make a showing as to an element that is critical to finding that she justifiably relied on the misrepresentation to her detriment.

In particular, Sparling has indicated that (1) she disclosed the existence and location of the easement to D'Amour as Lempert's agent subsequent to the contract of sale but prior to the closing, (2) D'Amour's knowledge either was communicated to Lempert or can be imputed to Lempert, and (3) Lempert could have rescinded the sale

prior to the closing upon learning of the existence of the easement. If all of these three allegations are true, then Sparling had corrected her alleged misrepresentation before it made any difference to Lempert's pecuniary interests, and Lempert was no longer justified in relying on it in closing the sale.

Lempert does not dispute that Sparling disclosed the existence and location of the easement to D'Amour prior to the closing. In fact, the easement is disclosed on the face of the deed. Lempert also does not dispute that she could have rescinded the sale prior to the closing on discovering the existence of the easement, inasmuch as the contract of sale provided that Singer "can and will deliver at the Closing marketable title via a Warranty Deed to [31 Fish Bay] *free and clear of any and all encumbrances*," and that "[i]n the event of a title defect that cannot be cleared prior to Closing, [Lempert], at [her] option, shall be released from any and all obligations" under the contract. Contract of Sale between Singer and Lempert, Nov. 21, 1989, ¶¶ 3, 9 (emphasis added).

D'Amour, in his affidavit, affirms that he discussed the easement at length with Lempert prior to the closing. *See* Affidavit of Kevin F. D'Amour in Support of Defendant Kevin F. D'Amour's Motion for Summary Judgment ¶ 7 [hereinafter D'Amour Aff.]. Lempert, in her affidavit, denies that D'Amour ever mentioned it to her. *See* Lempert Aff.Opp.D'Amour, *supra*, ¶ 12. Because resolution of this question requires a weighing of the credibility of the witnesses, the court may not decide the question on summary judgment, but must take Lempert's allegations as true. Sparling is still entitled to summary judgment on this issue, however, unless Lempert can make a sufficient showing that D'Amour's knowledge cannot be imputed to her.

When an agency relation exists, "[e]xcept where the agent is acting adversely to the principal or where knowledge as distinguished from reason to know is important, the principal is affected by the knowledge which an agent has a duty to disclose to the principal ... to the same extent as if the principal had the information." *Rest.2d Agency, supra*, § 275. Unless otherwise agreed, an agent "is subject to a duty to use reasonable efforts to give his principal information which is relevant to affairs entrusted to him and which, as the agent has notice, the principal would desire to have and which can be communicated without violating a superior duty to a third person." *Id.* § 381.

Lempert had executed a power of attorney—which, as previously discussed, is valid—granting D'Amour plenary authority to act on her behalf to effect the closing of the sale of 31 Fish Bay. It is clear beyond all doubt that a buyer of real estate would desire to know of the existence of an easement such as the one in this case, and it is undisputed that D'Amour had a duty to disclose the existence of the easement to Lempert. Lempert's allegations that D'Amour was acting adversely to her in order to ensure the early receipt of his fees are conclusory and without support in the affidavits or other evidence. Therefore, since the power of attorney is valid, the knowledge of the easement must be imputed to Lempert unless actual knowledge, "as distinguished from reason to know," is "important" under the applicable legal theory. *Id.* § 275.

■ Reason to know, not actual knowledge, is important here, since liability for misrepresentation will attach only if the reliance was "justifiable." That is, an unreasonable lack of knowledge will negate the requisite reliance. To be sure, the recipient of a misrepresentation is under no duty to investigate the truth of the representation, but is justified in relying on it even if an investigation would have revealed its falsity. *Rest.2d Torts, supra*, § 540. However, if the falsity is "obvious" to the recipient, reliance is not justified even if the recipient does not "know[] that it is false." *Id.* § 541. Thus, actual knowledge is not a necessary component of justifiable reliance. Accordingly, Lempert has failed to make out a claim for misrepresentation.

In sum, Sparling reasonably believed that D'Amour was acting as Lempert's agent and that he would communicate any material information to her. Accordingly, Sparling disclosed the information to D'Amour. This is all that she could reasonably be expected to do to correct the effect of her earlier alleged misrepresentation, which—assuming it even occurred—the court has no reason to believe was fraudulent or anything else other than completely innocent. Since Lempert was responsible for creating authority and the appearance of authority in D'Amour, then—as against Sparling—Lempert is ac-

countable for any mistakes made by D'Amour.

## Claim for Rescission of Contract Arising from Misrepresentation Regarding the Easement

■ Under certain circumstances, a misrepresentation can render a contract voidable. *Rest.2d Contr., supra,* § 164. A contract voidable for misrepresentation may be either ratified or avoided at the option of the party who was the recipient of the misrepresentation. *See id.* §§ 7, 164. When a party who has paid money under a contract that is voidable because of material misrepresentation exercises the option to avoid the contract, that party is entitled to restitution. *See id.* § 7 comment c, § 376; *Rest.Restitution, supra,* § 28(b).

Under the Restatement, the standards governing misrepresentation rendering a contract voidable are only slightly different from the standards for misrepresentation sounding in tort. For purposes of contract as well as tort, a misrepresentation is an assertion that is not in accord with the facts, *Rest.2d Contr., supra,* § 159, and for the same reasons already discussed, Lempert has raised an issue of fact as to whether Sparling made a misrepresentation concerning the existence and location of the easement.

Assuming in Lempert's favor that Sparling's actions may be imputed to Singer, the contract is voidable only if the misrepresentation was fraudulent or material, Lempert was justified in relying on it, and the misrepresentation substantially contributed to Lempert's decision to manifest her assent to the contract. *Id.* §§ 164, 167. As regards the contract of sale dated November 29, 1989, all of these elements appear to be established if it is assumed that Sparling made the alleged misrepresentation.

For the reasons previously stated, however, D'Amour's knowledge of the existence and location of the easement must be imputed to Lempert. Moreover, D'Amour was authorized to act on Lempert's behalf to close the sale. Thus, D'Amour's acceptance of delivery of the deed on Lempert's behalf must be treated as a ratification of the contract of sale in the light of knowledge of all the circumstances. *See Rest.2d Contr., supra,* § 380(2). Once a party has made the election to affirm or avoid a voidable contract, that party may not subsequently make a different election. *Id.* §§ 380, 382.

Furthermore, it must be remembered that the action here is not to rescind the initial contract of sale, which has now been destroyed by merger in the deed accepted at the closing, but to rescind the contract embodied in that deed. Again, because of D'Amour's knowledge imputed to her, Lempert cannot assert that she justifiably relied on the alleged misrepresentation in such a manner that it substantially contributed to her assent to that contract. Accordingly, Lempert does not make an adequately supported claim for rescission of the deed.

## Miscellaneous Claims for Misrepresentation

Lempert states that Sparling never told her that she would have to cross the boundary line of her property onto 32B Fish Bay to gain access to her own driveway. Because access across 32B Fish Bay is disclosed in the materials provided to D'Amour prior to closing, it is governed by what has already been said about the existence and location of the easement across 31 Fish Bay. Moreover, although the deed to 31 Fish Bay contains no express mention of an easement on 32B Fish Bay, Lempert has not alleged that no such easement exists. An easement on 32B Fish Bay appurtenant to 31 Fish Bay could have been created in some other recorded document or could have arisen by implication. In either event, it is difficult to understand how Lempert could have been damaged by the alleged misrepresentation.

■ Lempert also makes a set of allegations to the effect that Sparling prevented her from making a detailed inspection of the property. *See Smith v. Renaut,* 387 Pa.Super. 299, 306, 564 A.2d 188, 192 (1989); *Rest.2d Torts, supra,* § 550 (concealment). First, she charges that when she asked Sparling to take her to see the property a second time, Sparling told her that there was insufficient time to see the property before Lempert's scheduled departure from the islands. This claim borders on the frivolous. Lempert nowhere alleges that there was time to see the property before her departure. Even if there had been sufficient time, Sparling was under no duty to stop whatever she was doing and show Lempert the property on a moment's notice. If Lempert had rescheduled her flight or spoken to Sparling earlier,

Sparling might well have taken her to see the property again.

■ Second, Lempert charges that Sparling advised her, during Lempert's first and only inspection of the property, that the upstairs unit was locked and that she did not have the key. Again, Lempert does not allege that this statement was false. She also does not allege that Sparling would not have obtained the key from Singer if Lempert had asked her to do so. Although the agency contract between Singer and Sparling provided that Singer should provide the keys to Sparling, Lempert cannot claim that Singer or Sparling owed her a duty on that basis, because Lempert was not an intended third-party beneficiary of that contract. *See Rest.2d Contr., supra,* § 315. In addition, the regulation specifying that a real-estate broker should investigate pertinent facts does not purport to create any specific duty owed to prospective buyers, but merely requires the broker to make an investigation to ensure compliance with her existing "obligations to avoid error, exaggeration, misrepresentation, or concealment of pertinent facts." V.I.R. & Regs. tit. 27, § 422–51(d).

*Tort Liability for Emotional Harm and Physical Illness Resulting from Misrepresentation*

■ The standards governing tort liability for physical and emotional harm resulting from misrepresentation are different from those governing liability for pecuniary loss. Tort liability for physical harm resulting from a misrepresentation exists only if the harm results from an action taken in reasonable reliance on the misrepresentation, and the person making the misrepresentation knows its falsity and intends or should realize that it will induce action that involves an unreasonable risk of physical harm, *Rest.2d Torts, supra,* § 310, or is negligent as to its falsity and knows or should realize that the safety of others may depend on its accuracy. *Id.* § 311 & comment b. Someone whose conduct unintentionally causes emotional distress to another is liable for any resulting illness or bodily harm if that person "should have realized that [the] conduct involved an unreasonable risk of causing the distress ... and from facts known to [that person] should have realized that the distress, if it were caused, might result in illness or bodily harm." *Id.* § 313.

■ Misrepresentations concerning the condition, boundaries, and encumbrances of a piece of real property, without more, are not the sort that ordinarily involve an unreasonable risk of bodily harm. Lempert has presented no evidence that Singer or Sparling knew or should have known that Lempert was unusually sensitive to emotionally induced physical illness. On the basis of the evidence before the court, no reasonable jury could conclude that Singer and Sparling knew or should have known that the alleged misrepresentations involved an unreasonable risk of physical harm or that the physical safety of others depended on the accuracy of the information that they gave.

Emotional distress may be taken into account as an element of damages if other harm results from tortious conduct. *Rest.2d Torts, supra,* § 46 comment b, § 47 comment b, § 905(b) & comment c. If no other harm exists, however, damages may be recovered only when one "by extreme and outrageous conduct intentionally or recklessly causes severe emotional distress to another." *Id.* § 46. There is no liability for negligent infliction of emotional distress where no other harm is involved. *Id.* § 436A. Moreover, tortious conduct intended to invade legally protected interests of another does not, by that very fact, make the actor liable for emotional distress resulting from the conduct, unless other harm results from the conduct. *Id.* § 47.

The tort of intentional or reckless infliction of emotional distress is quite limited, extending only to "conduct ... so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community." *Id.* § 46 comment d. It does not extend to "mere insults, indignities, threats, annoyances, [or] petty oppressions...." *Id.* As already stated, the court has no reason to believe that the alleged misrepresentations, if any occurred, were not completely innocent. Even if they were not, the most that Lempert could demonstrate would be ordinary fraud. On these facts, Lempert has not made a viable claim for intentional or reckless infliction of emotional distress.

*Claims Against D'Amour*

D'Amour, in his reply memorandum of law, cites numerous cases for the proposition that expert testimony is necessary to establish attorney malpractice. He argues

that he is entitled to summary judgment on the basis that plaintiff has not submitted any affidavits from expert witnesses concerning the applicable standard of care. He also argues that Lempert has not produced any evidence that she suffered any damages as a result of his actions.

By failing to raise these issues in the memorandum of law in support of his motion for summary judgment, but leaving them for his reply brief, D'Amour has failed to meet his burden under *Celotex* of initially stating the basis for his motion. *See Celotex,* 477 U.S. at 325, 106 S.Ct. at 2554. His motion for summary judgment stated that there was no genuine issue of material fact as to the disclosure of all relevant information and as to the unavailability of damages for emotional distress, not that there was no genuine issue of material fact as to the applicable standard of care or the existence of pecuniary loss. D'Amour's attempt to change the basis for his motion in midstream, after Lempert has filed her opposition, works unfair surprise to Lempert.

Furthermore, Lempert's claim is not merely a claim for negligence. Lempert also states a claim for failure to satisfy an agent's duty to give information. Complaint ¶¶ 120–121; *see Rest.2d Agency, supra,* §§ 381, 399, 401. As previously mentioned, D'Amour avers that he discussed the easement at length with Lempert prior to the closing, D'Amour Aff., *supra,* ¶ 7, but Lempert denies ever discussing the matter with D'Amour or Dadlani. Lempert Aff.Opp.D'Amour, *supra,* ¶ 12. The determination of this issue depends on the credibility of the witnesses and is therefore a matter for trial.

Based on the tardiness of Lempert's response to his request for admissions, D'Amour also contends that Lempert has admitted that she received several drafts of the closing statement and a draft of the proposed deed prior to the closing. The court, however, has previously denied D'Amour's motion to deem these matters admitted, as well as a motion to reconsider that ruling. Lempert specifically denies that she ever received a copy of the deed prior to the closing. *Id.* ¶ 13.

D'Amour also argues that a facsimile transmission report that he has submitted establishes that he sent a copy of the deed to Lempert. The transmission report may, perhaps, establish that *something* was transmitted to the plaintiff, but contrary to D'Amour's assertion, it does not conclusively establish that what was transmitted was the deed.

D'Amour points to a statement in Lempert's deposition in which she admits receiving a copy of D'Amour's closing statement. Lempert Dep., *supra,* at 203. D'Amour, however, has failed to attach a copy of the closing statement or to give the court any indication of its contents. The court cannot, on this basis, conclude that the closing statement, as a matter of law, was sufficient to inform Lempert of the existence and location of the easement.

Finally, D'Amour's suggestion that damages for emotional distress are unavailable is without merit. If Lempert can show that she is entitled to damages for pecuniary loss or physical harm resulting from D'Amour's alleged negligence or failure to give information, she can also recover for emotional distress as part of the damages. *Rest.2d Torts, supra,* § 905(b).

*Conclusion*

For the foregoing reasons, Sparling is entitled to summary judgment. Because Lempert rests her claims against Singer entirely on vicarious liability for Sparling's acts, Singer is entitled to summary judgment as well. However, Lempert has established a genuine issue of material fact concerning her claim for damages against D'Amour, which must be resolved at trial. Lempert's motion for leave to amend her complaint is denied.

### MEMORANDUM

### ON MOTION FOR FINAL JUDGMENT

In an earlier opinion, with which familiarity is assumed, the court granted summary judgment to defendants Gerald Singer and Joan Sparling, and denied summary judgment to defendant Kevin D'Amour. *Lempert v. Singer,* 766 F.Supp. 1356 (D.V.I.1991) (Carter, J.). Sparling and Singer have now moved for entry of final judgment in their favor pursuant to Rule 54(b), F.R.Civ.P.

Rule 54(b) provides for the entry of final judgment with respect to fewer than all of the parties to an action "only upon an express determination that there is no just reason for delay." Rule 54(b), F.R.Civ.P.

The purpose of this rule is "to strike a balance between the undesirability of piecemeal appeals and the need for making review available at a time that best serves the needs of the parties." *Allis Chalmers Corp. v. Philadelphia Elec. Co.*, 521 F.2d 360, 363 (3d Cir.1975); *see also Panichella v. Pennsylvania R.R. Co.*, 252 F.2d 452, 454 (3d Cir.1958). The decision to certify a final judgment under Rule 54(b) is committed to the discretion of the district court, taking into account the interest of sound judicial administration as well as the equities of the case. *Curtiss Wright Corp. v. General Elec. Co.*, 446 U.S. 1, 8, 100 S.Ct. 1460, 1465, 64 L.Ed.2d 1 (1980); *Sears, Roebuck & Co. v. Mackey*, 351 U.S. 427, 437, 76 S.Ct. 895, 900–01, 100 L.Ed. 1297 (1956).

██ Upon reflection, and upon consideration of the submissions of the parties, the court has determined that certifying a final judgment at this time could result in a waste of the time and resources of the Court of Appeals. In particular, if it is determined at trial that D'Amour discussed the existence and location of the easement with Lempert prior to the closing, Lempert's assertions that she was harmed by reliance on the alleged misrepresentations or nondisclosures by Sparling with respect to those facts will be completely refuted. *A fortiori*, Lempert's claim that Singer is vicariously liable for Sparling's actions would also necessarily fail. Thus, any dispute as to the correctness of this court's legal conclusions in its summary judgment decision may become moot. The court may properly deny Rule 54(b) certification based on "the possibility that the need for review might ... be mooted by future developments in the district court." *Allis Chalmers, supra*, 521 F.2d at 364; *see Panichella, supra*, 252 F.2d at 455; *see also Curtiss Wright Corp., supra*, 446 U.S. at 6, 8, 100 S.Ct. at 1464, 1465.

Against this concern, the court must weigh Sparling's concern that the continued pendency of the litigation is having an adverse effect on her credit rating and professional reputation. *See Allis Chalmers, supra*, 521 F.2d at 364 (requiring a balancing of relevant factors); *Manufacturers Hanover Overseas Capital Corp. v. Southwire Co.*, 589 F.Supp. 214, 220 (S.D.N.Y.1984) (Carter, J.) (requiring a showing of hardship for a Rule 54(b) certification). This concern is particulary salient because Lempert's claim against Sparling borders on the frivolous.

If there were no possiblity of wasteful piecemeal appeals, the court would be inclined to grant Sparling's motion on this basis. However, weighing in the balance the concern that granting the motion could cause the Court of Appeals to consider issues that may soon become moot, the court concludes that this is not the "infrequent harsh case" meriting a Rule 54(b) certification. *Allis Chalmers, supra*, 521 F.2d at 365; *Panichella, supra*, 252 F.2d at 455; *see also Curtiss Wright Corp., supra*, 446 U.S. at 9–10, 100 S.Ct. at 1465–66; *Arlinghaus v. Ritenour*, 543 F.2d 461 (2d Cir.1976); *Manufacturers Hanover, supra*, 589 F.Supp. at 220–21. That is, the court cannot say that there is "no just reason for delay." Rule 54(b), F.R.Civ.P. Therefore, in the exercise of the court's discretion and in the interest of sound judicial administration, the motions of Sparling and Singer for final judgment are denied.

Sparling has moved for costs and attorney's fees pursuant to 5 V.I.C. § 541. She subsequently has moved for leave to withdraw that motion without prejudice and with leave to refile it after entry of final judgment. There being no opposition, the motion for leave to withdraw is granted.

Singer, too, has moved for costs and attorney's fees pursuant to 5 V.I.C. § 541. In the interest of judicial economy, consideration of the motion is deferred until final judgment after trial.

D'Amour has moved for the admission of Countess Pease Jeffries as an attorney *pro hac vice* in this case. Because the court is satisfied in regard to Jeffries' qualifications, the motion is granted.

An appropriate order will be entered.